All right, our last case this morning is 22-4006 Thompson v. Little America Hotel. Mr. Holdsworth, you may proceed. Thank you, Your Honor. May it please the Court, my name is Dave Holdsworth. I'm here on behalf of the appellant, the plaintiff, Larissa Thompson. I'd like to reserve just a minute, if I could, if we get to that point. Thank you. This is an employment discrimination case. My client is a native of the country of Russia, but a U.S. citizen, and worked as a supervisor in the fine gift shop at Little America Hotel in downtown Salt Lake City. She ends up getting terminated. The case comes before the district court on a motion for summary judgment, which is granted, and this appeal ensued. This morning, or this afternoon, I'd like to talk primarily about the pretext issue and the cat's paw theory that the plaintiff had articulated, or tried to articulate in the trial court below. Because I think that's where this appeal either, we either win or lose on that pretext cat's paw theory. Well, that assumes we agree with you that you made out a prima facie case, which I'm not sure I do. That's correct, Your Honor, and that is the threshold obligation of the plaintiff. The district court, I guess, gave the plaintiff the benefit of the doubt on that, and then proceeded to discuss pretext. With respect to the prima facie case, especially the fourth element, we know from the Supreme Court guidance in McDonnell Douglas that that's not to be viewed as an onerous burden, but it's still a burden. And what evidence the plaintiff tried to point to down below was the personal animosity that the supervisor, Carrie Lund, had towards her manager of the store, I should say, and the disparate treatment of how Ms. Lund was treating other non-Russian employees. And then a few other facts, such as the hostility or animosity towards Ms. Thompson's use of Russian language, especially to Russian customers, apathy towards her interest in discussing her culture and country. So the argument was that all of those put together could support an inference of discrimination on the basis of national origin. Okay, so the problem that I have is that all of these things that you're alleging have nothing to do with the decision maker, Mr. Mundell. In fact, in her deposition, Ms. Thompson admitted that she didn't think he had any problem with Russians or Russian language speakers. That's correct, Your Honor. And that really gets us to the, I think, the core of the district court's decision, which the proposition was that Mr. Mundell was an independent, sole decision maker. And the implication is that he was not influenced at all by anything that Ms. Lund may have done or put in the file. And that's where we think the inference was that he was influenced or tainted or contaminated by the information that was in the file that he referred to. He directly supervised her and coached her for over a year, correct? That is correct. And on at least two occasions he gave her explicit instructions and she admitted in her deposition that she violated, directly violated those instructions within days sometimes of when he had told her, don't do X. She went out and did X. That is true, Your Honor. I think we have to give some background to that. I don't disagree at all with Your Honor's summary of the facts with respect to that. Mr. Mundell comes on the scene because Ms. Lund involved him and he has access to the personnel file. Well, what's in the personnel file? Ms. Lund wants him to conclude this is a lady who cannot play well with others, who cannot get along, who has friction and conflict with other employees because she has papered up the file to that effect. Several coaching, I think they're called performance coaching or coaching reports, only three of which actually are seen by Ms. Thompson and which she disagrees with. But that's the file that comes to Mr. Mundell. So he is coming into the steps of being the supervisor of Ms. Thompson with the notion, with the concept that here is an individual that cannot get along with people. What else is in the file? Is the previous supervisor's coaching reports? Are those in the file? I think it's Ms. Fryer. Because these problems had manifested long before Lund. There were some issues that the previous supervisor, Diane Fryer, raised with Ms. Thompson. That's correct. I don't know that there was the kind of paper trail built against Ms. Thompson by Ms. Fryer. There were discussions. They were much more constructive according to Ms. Thompson's testimony. But there were some issues, I think, mostly with respect to parking. There were some issues with respect to getting along with other individuals. So it had been a concern. It hadn't, I think, resulted in any kind of discipline. There have been informal discussions regarding it. But to get back to your question, Judge McHugh, we have Mr. Mundell then coming on the scene thinking that this is the situation. He does. There is some concern in March of 2017. That's when the three counselings are issued that actually my client sees and responds to. Then there's nothing for a whole year, almost a year, 11 months. I don't know that the record is clear whether Mr. Mundell was still actively supervising Ms. Thompson during that 11-month period. Perhaps he was, perhaps he wasn't. He does come back on the scene in approximately March of 2018. Then about six weeks later, the termination occurs. Well, what is going on during that period, particularly in March of 2018? Well, we have, I think the reasonable inference is that we have Ms. Lund feeding information to Mr. Mundell. Because Mr. Mundell is... There's nothing, there's no evidence of that, right? In his declaration, Mr. Mundell does not state that. He leaves it, he's kind of coy. He says, I became aware of information, I came to understand. The source of that information is left unsaid. That's correct. Coming to your cat's paw theory, it's clear on this record that Mr. Mundell had independent knowledge of your client's performance and had previous disciplinary interactions. He does have an independent source of knowledge, which may be enough to justify a termination. But you're saying his decision was tainted because he received false or misleading information from Ms. Lund who papered the file to make Ms. Thompson look bad. Does that... I mean, I'm trying to understand under your interpretation of our cat's paw cases, whether just because there's some tainted info in a file, is that enough to get us out of summary judgment to a trial? Or under McDonnell Douglas, there's a lack of... There's not a reason to believe that the termination was pretextual. I think it does get us past summary judgment because the individual who comes on the scene isn't really independent. He has this taint, if you will, by what's in the file and what has been told by Ms. Lund and what Ms. Lund keeps feeding him. And he doesn't... What we do know is that he doesn't engage in an independent investigation. For example, Ms. Lund writes a letter to the co-worker, co-supervisor, George Rowe, a very short note, and says, Hey, you really need to stay off your phone. It's not good. And Mr. Mundell doesn't focus on that. Another letter that Ms. Thompson wrote to Mr. Rowe, George Rowe said, Hey, there's been a complaint that you were rude to a customer, a long-term customer. I think it was actually a neighbor of Ms. Thompson's. Mr. Mundell doesn't come in and investigate. Well, was Mr. Rowe on the phone excessively? Was Mr. Rowe rude to the customer? He just takes that as fact and then proceeds to conclude, Well, here's an employee that just can't get along with co-workers. Was this before or after Mr. Mundell directly instructed her not to supervise her co-workers, not to criticize them, not to supervise them, not to reprimand them? That's the most problematic problem in this case. It's a problematic problem. It is a very big problem, and it was he, Mr. Mundell, did instruct Ms. Thompson to avoid doing that. Not to avoid it. He said, Don't do it. Don't do that. It was a direct order from a pretty high-up person in the Little America structure, and days later she blatantly violates it. And I see nothing to suggest that the fact that she was born in Russia had anything to do with her problems with Mr. Mundell. And isn't that what we need to find here? It's not just that they were wrong or Roe really did do something inappropriate, because we're not the HR department. It has to be that it's based on some impermissible discriminatory reason, and I just don't see a connection there with Mr. Mundell. Well, I think that's a fair summary, and I think a reasonable jury could certainly make that conclusion. I think the question is, is that the only conclusion that a reasonable jury could find? Well, they would have to speculate that Mr. Mundell somehow didn't like Russians with zero evidence. Or that he was tainted or contaminated by what had already been put in the file. Well, there's nothing in the file about she's Russian and we don't like her because she's Russian. I mean, you know, you're talking about papering the file with violations, rules that were documented that you think were over-documented. Even if that were true, it wouldn't be a discrimination claim. I would tend to agree with Your Honor. Yes, thank you. Regarding the cat's paw theory and the cases, this one is different. It seems much weaker in that Mundell has his own reason for terminating. He's not just relying on Lund. He has that insubordination we've been talking about, and her going to the CEO and going to the owner, all insubordinate acts. And finally he's had enough and he says you're fired. Is there anything in Staub or any of the four published opinions from the 10th Circuit since Staub that liken anything, black-oil litter or anything alike with that regard? Do they have that common element where it's the supervisor who's firing that is the one who has been treated insubordinately? I don't think so. I would tend to agree with Your Honor. I think the two cases that have followed Staub, particularly the Thomas v. Barry Plastics case, and then the Singh case from a couple of years ago, are a little different because there was an independent body that viewed the termination decision. So there was a check and balance. Here there really wasn't. It looks like I'm out of time. Thank you. Thank you, counsel. Mr. Bednar? Members of the court, Stephen Bednar of Manninghurst-Brettschvon Bednar on behalf of Little America Hotel. I'm grateful for the court's preparation. I think I'd like to begin just by addressing a particular issue that relates to the cat's paw that I don't think was very fully briefed. But I think the court should be aware of. And that is I don't think it's properly before this court. The only reference to the first reference to cat's paw in this proceeding is on page 28 of the appellant's brief before this court. It doesn't come up before the district court. The only plausible reference to it or the only possible introduction to it in the court below comes at volume two of the appendix, page 288. It's page 41 of appellant's brief in opposition to summary judgment where this is what is written. While it is certainly possible that Mark Mundell just involved himself in the inner workings of the gift shop, Sua Sponte, without receiving any request from Cary Lund and without receiving any information from Cary Lund, the more plausible inference and explanation is that he did so because Cary Lund requested his involvement and Cary Lund explained the alleged problems she had been having with Ms. Thompson. That's it. There's no argument of causation. And the simple raising the specter of speculation that Cary Lund may have involved Mark Mundell or that he may have become spontaneously involved is not enough to invoke an argument of the cat's paw. And so in the district court's opinion, there's nothing for you to review. There's no reference or discussion or analysis of the cat's paw because it simply wasn't raised. And so I felt like that should be brought up here in oral argument because it wasn't really addressed in the briefs. But I don't think the cat's paw is before the court. If it were before the court, Pinkerton and Singh smother it at every level. Pinkerton establishes the proposition that in order to make a cat's paw argument, you have to show a biased subordinate and you have to show proximate cause between that biased subordinate and the action of the unwittingly manipulated supervisor who becomes the voice of that prejudice. And in Pinkerton, neither of those were established. And the reason they couldn't show a bias of the subordinate is because the reviews that the first supervisor in Pinkerton prepared were similar in the criticisms of the reviews that the second supervisor in Pinkerton prepared, which is the exact same situation we have here with the first supervisor, Diane Fryer, who wrote up Ms. Thompson for parking in the parking lot, for speaking Russian in the store, for using her phone, and for other matters, which are the exact same criticisms that Mrs. Lund brought up. And in the context of Diane Fryer, Ms. Thompson admitted in deposition that those criticisms were, in fact, fair. She characterized them as fair. She testified Fryer's criticisms and reviews issues were, quote, very fair and she respected them. Those are the exact same criticisms that Ms. Lund brought. And so if you did get the cat's paw, you'd fail at that first step. And if you got past the first step, you hit a brick wall at the second when you come to the question of approximate causation. The SING case stands for the proposition that once someone interjects themselves and interacts personally, individually, with the person who experiences the adverse employment action, the causal chain of unwitting manipulation is broken. And certainly that happened here. It happened twice. It happened in February of 17, when Mr. Mundell sat down with Ms. Thompson because she had taken a commission from a subordinate improperly and he told her that she shouldn't have done that. That happened in February of 17. And then just 10 days later, she did it again. The exact same thing. And in deposition and in briefing, the testimony was just, well, she forgot. But she violated that instruction. And then we come to March of 18, and we have the instruction that Judge McHugh raised that because of all the interpersonal conflict that existed between Thompson and her coworkers, Mr. Mundell gave her the explicit instruction that she was not without the direct involvement of Carrie Lund to, quote, correct or criticize any employee and only focus on the good things they do. Go to Carrie Lund for any problems that need to be addressed. Focus on this specifically for the next 90 days. This came in response to a note that was written by George Rowe, who was a peer-level supervisor, who was also not accused of any discriminatory animus, who complained that she had threatened him after he had helped her fix a computer problem, and she became worried that he might expose her computer ineptitude. And so she wrote him this note. George Rowe, who is, again, immune from the accusation of animus, brought it to Mundell's attention. And Mundell sat down with Thompson and said, don't criticize and don't discipline without the involvement of Carrie Lund. Twenty-one days later, as Judge McHugh said, she did exactly that. She accused her own subordinate, Peggy Cunales, of negligence in allowing the circumstance where a theft might occur that involved a bathing suit and a watch. And Ms. Cunales came and complained that she had been nitpicked again by Ms. Thompson. Mark Mundell interjected himself again. He did interview and speak to Ms. Thompson about it, which, by the way, Pinkerton establishes that if you speak with the person who is the alleged victim of cat paw manipulation, that in and of itself breaks the chain. And so Mr. Mundell has done that, and he gives her the second direction, saying, I told you this 21 days ago. I'm going to tell you again. And he told her not to let it happen again. From 226 of the record, I reiterated again that I did not want her to counsel any of the team members without Carrie. Tenure on the team averages 10 plus years. Stress that other coworkers are feeling when you are around is not good, and it has to change. This is the fifth or sixth time I have had to deal with employee relation issues involving Thompson, and it's becoming challenging. Six days later, we're right back at the same place when Ms. Thompson writes the letters on April 12th to George Rowe, one telling him to put away his cell phone, and one telling him that he's been rude with the customer and that she's going to have to report him up the chain. George Rowe, again, himself immunized from any discriminatory animus, comes to Mark Mundell, also immunized from discriminatory animus, reports that event, and Mr. Mundell makes the conclusion that she had deliberately and directly disobeyed my specific instructions. That's his declaration, page 163 on the record, paragraph 23. I was deeply concerned that Thompson was significantly hurting the morale and efficiency of the retail department, paragraph 24, page 163 of the record. Neither Thompson's race nor national origin had anything to do with my decision to terminate her employment. That record is unrefuted, and it just doesn't tolerate an inference of discrimination at the prima facie level, which the district court gratuitously granted here for purposes of analysis, and certainly won't What about the, you can't speak Russian, but you can speak Spanish? Is that enough for Lund as far as the prima facie and inference of discrimination? So, two responses. First of all, if it happened, I can read you exactly what it says in the record about that, and the record indicates that what happened with respect to that is that Ms. Thompson testified in deposition that outside of the store, where there are a lot of Hispanic workers in housekeeping and so forth, that Spanish was frequently spoken. So, factually, it stands on very tenuous ground. Legally, in terms of analysis, it doesn't make a bit of difference, because all of the accusations that can be made against Carrie Lund or Peggy Cunales, who are the only two individuals accused of discriminatory animus, even if you accept all of those as true, none of them reach Mark Mundell. And the only thing that that gets to in the cat's paw analysis is the first problem, is whether there is discriminatory bias at the subordinate level. Even if there is, it's got to infect Mark Mundell's motives to become relevant, and it never reaches it here. Now, having said that, you also have testimony that neither Peggy or Carrie Lund ever said anything negative about Russians. And so you're left to speculate whether it's just two people that don't get along, or whether there's really some kind of national origin-based animosity here. And it's pure speculation to suggest that it comes out of national origin. But even if you grant that assumption, it bludgeons itself against the brick wall of Mark Mundell and his exoneration from improper motive. Does that answer your question? Does Mr. Mundell, does he say, based on the insubordination that I endured from my orders to her that she disobeyed, that would have been enough to terminate and I would have terminated? Or does he say, years and years and years and years and years, that's the final straw? And does it make a difference? I'll tell you exactly what he said. And the short answer is, it's because of his personal interaction and her deliberate recalcitrant disobedience with the instructions that he gave her in a short duration. This is page 163 of the record, paragraph 23 of his declaration. When I learned of and reviewed the two notes Thompson had given George Rowe on April 12, 2018, I felt that Thompson had directly and deliberately disobeyed my specific instructions to her. Paragraph 24, I was also deeply concerned that Thompson was significantly hurting the morale and efficiency of the retail department. Paragraph 25, I determined that it was in Little America's best interest to terminate Thompson's employment. Neither Thompson's race or national origin had anything to do with my decision. I was solely responsible for the decision to terminate Thompson's employment. So it's certainly he's aware of what had gone on in 17, and he's obviously, but what happened in 2018 with this? That's the brick that breaks the camel's back. It's not a straw. It's a 4,000-pound brick that breaks the camel's back. That's the precipitant of the termination, and it's beyond reproach. My light is yellow. Unless the members of the court have any questions, I'll rest. Thank you, counsel. You're excused. Both counsel are excused, and the case shall be submitted.